**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Yaribel RABELO-RODRIGUEZ,

Alexis FERNANDEZ-PEREZ,

A- F-R- (**a minor child**),

Adrian HERNANDEZ-BORGES,

Rene Caridad ROMAN-HERNANDEZ,

Marile PACHECO-CHAVEZ,

M- K- R-P- (**a minor child**),

Elaine MARTINEZ-MILANES,

Consuelo IZQUIERDO-MIRANDA,

Yanara MENDOZA-CINTRA,

A- K- R-M- (**a minor child**),

Ivonne GUTIERREZ-MOLL,

Adelmis REVE-MARQUEZ,

Celia Natividad GONZALEZ-GARCIA,

Isis de la Caridad SILVEIRA-LOZADA,

Ivonne LEYVA-MENDEZ,

Lesmy LEDESMA-BELTRAN,

E- L-L- (**a minor child**),

L- L-L- (**a minor child**),

Yerennis RONDON-HERNANDEZ,

Jesus RIOS-GARCIA,

 Plaintiffs,

v.

**ALEJANDRO MAYORKAS**, in his official capacity as the United States Secretary of Homeland Security,

 Defendant.

Case No. _____

**CLASS ACTION**
**COMPLAINT FOR DECLARATORY**
**AND INJUNCTIVE RELIEF**

## CLASS ACTION COMPLAINT FOR
## <u>DECLARATORY AND INJUNCTIVE RELIEF</u>

Summary of Claim ...................................................................................................................1

Jurisdiction ..............................................................................................................................2

Venue ......................................................................................................................................2

Exhaustion of Remedies ..........................................................................................................3

Parties .....................................................................................................................................3

Legislative and Political History .............................................................................................7

Legal Framework for Entry and Detention ............................................................................19

Relevant Factual Allegations

     I.       Yaribel Rabelo-Rodriguez ...............................................................23

     II.      Alexis Fernandez-Perez ...................................................................24

     III.     A- F-R- (a minor child) ...................................................................25

     IV.     Adrian Hernandez-Borges ...............................................................26

     V.      Rene Caridad Roman-Hernandez .....................................................28

     VI.     Marile Pacheco-Chavez ...................................................................29

     VII.    M- K- R-P- (a minor child) .............................................................30

     VIII.   Elaine Martinez-Milanes ................................................................31

     IX.     Consuelo Izquierdo-Miranda ..........................................................32

     X.      Yanara Mendoza-Cintra ..................................................................33

     XI.     A- K- R-M- (a minor child) ............................................................34

     XII.    Ivonne Gutierrez-Moll ....................................................................35

     XIII.   Adelmis Reve-Marquez ...................................................................35

     XIV.   Celia Natividad Gonzalez-Garcia .....................................................36

XV.    Isis de la Caridad Silveira-Lozada ........................................................37

XVI.   Ivonne Leyva-Mendez ........................................................................38

XVII.  Lesmy Ledesma-Beltran ....................................................................39

XVIII. E- L-L- (a minor child) ......................................................................40

XIX.   L- L-L- (a minor child) ......................................................................42

XX.    Yerennis Rondon-Hernandez ............................................................43

XXI.   Jesus Rios-Garcia ..............................................................................44

Allegations of Legal Error .........................................................................................45

Class Allegations .......................................................................................................50

Claims for Relief

Count I  — Impermissible Construction of the Statutes ....................................53

Count II — Lack of Reasoned Consideration ...................................................53

Prayer for Relief ........................................................................................................54

## CLASS ACTION COMPLAINT FOR
## DECLARATORY AND INJUNCTIVE RELIEF

The plaintiffs, by and through the undersigned, allege as follows:

## SUMMARY OF CLAIM

Following the conclusion of the special parole program for Cuban nationals that was implemented in conformance with 8 U. S. C. § 1225(b)(1)(F)—colloquially referred to as the "wet-foot/dry-foot policy"—the Department of Homeland Security continued to release Cuban nationals into the United States without keeping them in mandatory detention under §§ 1225(b)(1) and (b)(2). But rather than document their parole into the United States under § 1182(d)(5), the Department purported to "conditionally parole" these Cuban nationals into the United States under § 1226(a) as a method to preclude them from obtaining the benefits that Congress has historically offered to Cuban nationals under the Cuban Refugee Adjustment Act of 1966 (CAA), Pub. L. No. 89-732, 80 Stat. 1161 (as amended).

Many Cuban nationals who find themselves in this situation are currently in immigration limbo, left with no path to legal status or work authorization, often still awaiting the commencement of removal proceedings for years after having entered the United States. In fact, many will not even be subject to physical removal under the current Migration Accords.

This complaint is brought on behalf of several families made up of Cuban nationals who sought refuge in this country after the termination of the wet-foot/dry-foot policy. They applied for permanent residence under the Cuban Adjustment Act arguing that their release must be a parole under § 1182(d)(5) as matter of law, relying upon the Supreme Court's explication of how the modern immigration detention system functions in *Jennings* v. *Rodriguez*, 138 S. Ct. 830 (2018). They bring this action on their own behalf and on behalf of all other Cuban nationals similarly situated.

## JURISDICTION

1.      This action is brought against the defendant, and those acting under him, for refusing to comply with their federally mandated duties under the Cuban Refugee Adjustment Act of 1966 (CAA), Pub. L. No. 89-732, 80 Stat. 1161 (as amended), the Immigration and Nationality Act of 1952 (INA), Pub. L. No. 82-414, 66 Stat. 163 (codified as amended at 8 U. S. C. §§ 1101 et seq.), Title 8 of the Code of Federal Regulations, and the Administrative Procedure Act (APA), 5 U. S. C. §§ 701, et seq.

2.      This Court has jurisdiction under 28 U. S. C. § 1331 (federal question), and § 1346(a)(2) (United States as defendant).

3.      This Court may grant relief pursuant to 5 U. S. C. §§ 702, 706 (judicial review of agency action), 28 U. S. C. § 1651 (All Writs Act), and 28 U. S. C. §§ 2201–02 (Declaratory Judgment Act).

4.      The INA's jurisdictional bar regarding discretionary judgments applicable to applications made under the general adjustment of status statute, 8 U. S. C. § 1252(a)(2)(B)(i), does not apply to applications made under the Cuban Refugee Adjustment Act.   *Perez* v. *USCIS*, 774 F. 3d 960, 967–68 (CA11 2014).

## VENUE

5.      Venue is proper in this district because:

    (a)   "a substantial part of the events or omissions giving rise to the claim occurred" in this district, 28 U. S. C. § 1391(e)(1)(A);

    (b)   the defendant "resides" in this district, § 1391(e)(1)(B), *Bartman* v. *Cheney*, 827 F. Supp. 1 (D.D.C. 1993) ("Officers and agencies of the United States can have more than one residence, and venue can properly lie in more than one

jurisdiction."); and

    (c)    several of the plaintiffs reside in this district, § 1391(e)(1)(C), *A.J. Taft Coal Co.*
v. *Barnhart*, 291 F. Supp. 2d 1290, 1301–02 (N.D. Ala. 2003) (collecting cases
demonstrating that "residency of 'the plaintiff' should be interpreted to mean *any*
plaintiff rather than *all* plaintiffs") (emphasis in original).

## EXHAUSTION OF REMEDIES

6.    As per *Darby* v. *Cisneros*, 509 U. S. 137 (1993), there are no available administrative remedies, or other remedies for review under the INA or its implementing regulations that require exhaustion before pursuing judicial review under the APA in this case.

7.    Further, because immigration judges have no jurisdiction over "arriving alien" Cuban nationals, there is no need to exhaust their applications through removal proceedings, and a district court is thus the proper forum for review of a USCIS denial of a Cuban Adjustment application.  *Perez* v. *USCIS*, 774 F. 3d 960, 966–67 (CA11 2014).

## PARTIES

8.    Defendant **ALEJANDRO MAYORKAS** is sued in his official capacity as the United States Secretary of Homeland Security.   In this capacity, he has supervisory authority over all operations of the Department of Homeland Security (DHS) and its component agencies.   This includes authority over U. S. Citizenship and Immigration Services (USCIS) which is responsible for the adjudication of affirmative immigration benefits, including applications for permanent residence under the Cuban Adjustment Act.

9.    Plaintiff **Yaribel RABELO-RODRIGUEZ** is a native and citizen of Cuba who resides in Miami-Dade County, Florida.   Her application for permanent residence under the Cuban Adjustment Act was denied by the **USCIS National Benefits Center**.   Her application was

assigned receipt numbers MSC-20-915-89846 and MSC-20-911-34032.

10.     Plaintiff **Alexis FERNANDEZ-PEREZ** is a native and citizen of Cuba who resides in Miami-Dade County, Florida.   His application for permanent residence under the Cuban Adjustment Act was denied by the **USCIS National Benefits Center**.   His application was assigned receipt numbers MSC-20-915-89845 and MSC-20-911-34030.

11.     Plaintiff **A- F-R-** (a minor child) is a native and citizen of Cuba who resides in Miami-Dade County, Florida.   She is the child of plaintiffs Yaribel Rabelo-Rodriguez and Alexis Fernandez-Perez.   Her application for permanent residence under the Cuban Adjustment Act was denied by the **USCIS National Benefits Center**.   Her application was assigned receipt numbers MSC-20-915-89847 and MSC-20-911-34028.

12.     Plaintiff **Adrian HERNANDEZ-BORGES** is a native and citizen of Cuba who resides in Miami-Dade County, Florida.   His application for permanent residence under the Cuban Adjustment Act was denied by the **USCIS National Benefits Center**.   His application was assigned receipt number MSC-21-900-39777.

13.     Plaintiff **Rene Caridad ROMAN-HERNANDEZ** is a native and citizen of Cuba who resides in Miami-Dade County, Florida.   His application for permanent residence under the Cuban Adjustment Act was denied by the **USCIS National Benefits Center**.   His application was assigned receipt number MSC-20-912-74696.

14.     Plaintiff **Marile PACHECO-CHAVEZ** is a native and citizen of Cuba who resides in Miami-Dade County, Florida.   Her application for permanent residence under the Cuban Adjustment Act was denied by the **USCIS National Benefits Center**.   Her application was assigned receipt number MSC-20-912-74698.

15.     Plaintiff **M- K- R-P-** (a minor child) is a native and citizen of Cuba who resides in

4

Miami-Dade County, Florida.    She is the child of plaintiffs Rene Caridad Roman-Hernandez and Marile Pacheco-Chavez.    Her application for permanent residence under the Cuban Adjustment Act was denied by the **USCIS National Benefits Center**.    Her application was assigned receipt number MSC-20-912-74694.

16.    Plaintiff **Elaine MARTINEZ-MILANES** is a native and citizen of Cuba who currently resides in Miami-Dade County, Florida.    Her application for permanent residence under the Cuban Adjustment Act was denied by the **USCIS Jacksonville Field Office**.    Her application was assigned receipt number MSC-20-903-75603.

17.    Plaintiff **Consuelo IZQUIERDO-MIRANDA** is a native and citizen of Cuba who resides in Miami-Dade County, Florida.    Her application for permanent residence under the Cuban Adjustment Act was denied by the **USCIS National Benefits Center**.    Her application was assigned receipt number MSC-20-910-16022.

18.    Plaintiff **Yanara MENDOZA-CINTRA** is a native and citizen of Cuba who resides in Palm Beach County, Florida.    Her application for permanent residence under the Cuban Adjustment Act was denied by the **USCIS West Palm Beach Field Office**.    Her application was assigned receipt number MSC-20-913-96723 .

19.    Plaintiff **A- K- R-M-** (a minor child) is a native and citizen of Cuba who resides in Palm Beach County, Florida.    She is the child of plaintiff Yanara Mendoza-Cintra.    Her application for permanent residence under the Cuban Adjustment Act was denied by the **USCIS West Palm Beach Field Office**.    Her application was assigned receipt number MSC-20-913-96727.

20.    Plaintiff **Ivonne GUTIERREZ-MOLL** is a native and citizen of Cuba who resides in Broward County, Florida.    Her application for permanent residence under the Cuban Adjustment Act was denied by the **USCIS Oakland Park Field Office**.    Her application was assigned

receipt number MSC-20-901-66905.

21.    Plaintiff **Adelmis REVE-MARQUEZ** is a native and citizen of Cuba who resides in Miami, Florida.   Her application for permanent residence under the Cuban Adjustment Act was denied by the **USCIS National Benefits Center**.   Her application was assigned receipt number MSC-21-911-65249.

22.    Plaintiff **Celia Natividad GONZALEZ-GARCIA** is a native and citizen of Cuba who resides in Houston, Texas.   Her application for permanent residence under the Cuban Adjustment Act was denied by the **USCIS Houston Field Office**.   Her application was assigned receipt number MSC-20-913-97746.

23.    Plaintiff **Isis de la Caridad SILVEIRA-LOZADA** is a native and citizen of Cuba who resides in Fort Worth, Texas.   Her application for permanent residence under the Cuban Adjustment Act was denied by the **USCIS Irving Field Office**.   Her application was assigned receipt number IOE-09-100-57973.

24.    Plaintiff **Ivonne LEYVA-MENDEZ** is a native and citizen of Cuba who resides in Las Vegas, Nevada.   Her application for permanent residence under the Cuban Adjustment Act was denied by the **USCIS Las Vegas Field Office**.   Her application was assigned receipt number MSC-20-913-59539.

25.    Plaintiff **Lesmy LEDESMA-BELTRAN** is a native and citizen of Cuba who resides in Las Vegas, Nevada.   She is the adult daughter of plaintiff Ivonne Leyva-Mendez.   Her application for permanent residence under the Cuban Adjustment Act was denied by the **USCIS Las Vegas Field Office**.   Her application was assigned receipt number MSC-20-913-59541.

26.    Plaintiff **E- L-L-** (a minor child) is a native and citizen of Cuba who resides in Las Vegas, Nevada.   She is the minor child of plaintiff Lesmy Ledesma-Beltran and granddaughter

of plaintiff Ivonne Leyva-Mendez.   Her application for permanent residence under the Cuban Adjustment Act was denied by the **USCIS Las Vegas Field Office**.   Her application was assigned receipt number MSC-20-913-59537.

27.     Plaintiff **L- L-L-** (a minor child) is a native and citizen of Cuba who resides in Las Vegas, Nevada.   She is the minor child of plaintiff Lesmy Ledesma-Beltran and granddaughter of plaintiff Ivonne Leyva-Mendez.   Her application for permanent residence under the Cuban Adjustment Act was denied by the **USCIS Las Vegas Field Office**.   Her application was assigned receipt number MSC-20-913-59543.

28.     Plaintiff **Yerennis RONDON-HERNANDEZ** is a native and citizen of Cuba who resides in Columbus, Nebraska.   Her application for permanent residence under the Cuban Adjustment Act was denied by the **USCIS Omaha Field Office**.   Her application was assigned receipt number MSC-20-904-31205.

29.     Plaintiff **Jesus RIOS-GARCIA** is a native and citizen of Cuba who resides in Richfield, Minnesota.   His application for permanent residence under the Cuban Adjustment Act was denied by the **USCIS Minneapolis Field Office**.   His application was assigned receipt number MSC-20-901-04115.

## LEGISLATIVE AND POLITICAL HISTORY

30.     Trouble began on July 26, 1953, when an insurrection led by a young Fidel Castro was staged against the U. S.-backed Batista regime in Santiago de Cuba.

31.     Ultimately, on January 1, 1959, Che Guevara marched troops from Santa Clara into Havana without resistance, while Castro marched troops into the Moncada Army Barracks where all 5,000 of the soldiers stationed there defected to the revolution.

32.     " 'Normal' immigration from Cuba to the United States has not existed since the

Cuban Revolution of 1959 brought Fidel Castro to power.    For more than 50 years, the majority of Cubans who have entered the United States have done so through special humanitarian provisions of federal law" as part of "a unique set of circumstances [that] is unlike U. S. immigration policy toward any other nation in the world."    Bruno, A., Cong. Research Serv., *U. S. Policy on Cuban Migrants: In Brief*, at 1 (Dec. 16, 2016).[1]

33.    "The first emigres who came in 1958 were, according to the history of the time, followers of General Fulgencio Batista . . . ."    Wasem, R. E., Cong. Research Serv., *Cuban Migration to the United States: Policy and Trends*, at 1 (June 2, 2009).[2]

34.    A few years after the Castro takeover, the United States cut diplomatic ties with the Cuban government on January 3, 1961, following a tug-of-war of economic sanctions by the U. S. and property seizures by the Cuban government.    Sullivan, M. P., Cong. Research Serv., *Cuba-U. S. Relations: Chronology of Key Events 1959-1999*, at 1–2 (Dec. 14, 1999).[3]

35.    Following the failed Bay of Pigs invasion in April 1961, Castro declared during a public speech on December 2, 1961, "I am a Marxist-Leninist, and I shall be a Marxist-Leninist to the end of my life."[4]

36.    "[T]he exodus escalated, peaking at approximately 78,000 in 1962.    In October of that year, Castro stopped regularly scheduled travel between the two countries, and the risky practice of asylum seekers setting sail from Cuba to Florida began."    Wasem, *supra* n. 2, at 1.

37.    "[T]he Cubans who arrived in the United States after the Cuban Revolution were

---

[1] Available at: https://fas.org/sgp/crs/row/R44714.pdf.

[2] Available at: https://fas.org/sgp/crs/row/R40566.pdf.

[3] Available at: https://www.hsdl.org/?view&did=484262.

[4] Transcript of speech produced in Fair Play for Cuba Comm., *Fidel Castro Speaks on Marxism-Leninism*, at 64 (1962), available at: https://ucf.digital.flvc.org/islandora/object/ucf%3A5073.

paroled in, [and] considered the be refugees fleeing persecution."   Bruno, *supra* n. 1, at 1.

38.   "Refugees, as distinct from immigrants, are aliens who flee their country of nation-ality generally because of persecution or fear of persecution."   Traditionally however, "refugees were indistinct from immigrants under [the 1917 and 1924] immigration laws."   Staff of S. Comm. on the Judiciary, 96th Cong. 2d Sess., *Review of U. S. Refugee Resettlement Programs and Policies* ("Refugee Review"), at 1 (Comm. Print 1980).[5]

39.   Things changed when "[m]illions of people were uprooted during or following World War II, which required extraordinary measure to reduce the human suffering and disruption it brought about," such that "the United States adopted a series of special refugee programs outside the regular immigration law."   Refugee Review, *supra* n. 5, at 1.

40.   With the 1952 "consolidat[ion] [of] previous immigration laws into one statute," "[t]he parole provision of the Immigration and Nationality Act, section 212(d)(5), [8 U. S. C. § 1182(d)(5),] incorporated into statutory law a provision authorizing the temporary parole of al-iens into the United States, which had been an administrative practice of longstanding."   Refugee Review, *supra* n. 5, at 7–8.

41.   "Parole has since been used as the primary basis for entry of large numbers of ref-ugees."   Refugee Review, *supra* n. 5, at 8.

42.   For example, "[b]etween 1962 and 1979, hundreds of thousands of Cubans entered the United States under the Attorney General's parole authority."   Wasem, *supra* n. 2, at 1 (foot-note omitted).

43.   In an attempt to move away from the ad hoc parole process, Congress enacted the "conditional entry provision," as part of the 1965 move from race-based quotas to "the new

---

[5] Available at: https://files.eric.ed.gov/fulltext/ED206779.pdf.

immigrant visa preference system for the Eastern Hemisphere," serving as a formal mechanism to admit refugees and allow them to obtain permanent resident status after two years of physical presence in the United States under another new provision in the INA.   Refugee Review, *supra* n. 5, at 11–12.

44.     "Cuban refugees . . . began to be paroled in the United States in 1961 when diplomatic relations between the United States and Cuba were severed.   As Western Hemisphere natives, Cubans were not eligible for conditional entry when that provision became law, since it applied only to the Eastern Hemisphere."   Refugee Review, *supra* n. 5, at 13.

45.     In October 1965, 3,000 Cubans left Cuba from Camarioca in a boatlift to the United States.   Sullivan, *supra* n. 3, at 3; accord *The "Other" Boatlift: Camarioca, Cuba, 1965*, at 1 ("On 28 September 1965 Fidel Castro made the surprising announcement that beginning on 10 October 1965, the port of Camarioca would be opened so that any Cubans desiring to leave for 'the Yankee paradise' could do so.   Any boats of Cuban exiles that wished to return to Cuba to evacuate relatives would be permitted into Camarioca.").[6]

46.     The following month, in November 1965, "[f]reedom flights to the United States began with some 250,000 Cubans emigrating to the United States by 1971."   Sullivan, *supra* n. 3, at 3; accord Refugee Review, *supra* n. 5, at 13 ("After the Cuban airlift program was announced by President Johnson in 1965, the number of these refugees admitted under the parole authority increased dramatically.").

47.     As for the ability to attain permanent resident status, "[d]uring the mid-1960s, the Immigration and Nationality Act did not permit the adjustment of status of Western Hemisphere

---

[6]     Available   at:   https://media.defense.gov/2020/Jul/02/2002356759/-1/-1/0/CAMARI-OCA1965.pdf.

natives," Refugee Review, *supra* n. 5, at 16, meaning that they were required to leave the United States to apply for an immigrant visa—available only to certain specified classes of persons—at a consular post abroad, see 8 U. S. C. § 1201(a)(1)(A).

48.     In fact, at the time, "[e]xisting law, section 245(c) of the Immigration and Nationality Act, provide[d] that natives of any country of the Western Hemisphere, or of any adjacent island named . . . , [we]re precluded from applying for adjustment to permanent resident status while in the United States."   H.R. Rep. No. 89-1978, at 2 (1966) (Jud. Comm.) (copy at **App. I, Exh. A**, at 3.

49.     Thus, Congress passed the Cuban Refugee Adjustment Act in 1966 which "enabled Cuban refugees to adjust their status to that of permanent residents" while inside the United States. Refugee Review, *supra* n. 5, at 16; accord Sullivan, *supra* n. 3, at 3 ("The objective was to give Cubans who had fled the island a preferential procedure for seeking permanent residency.")

50.     Early agency precedent established that "this is remedial legislation, such [that] a strict interpretation is to be avoided if it thwarts the congressional intent."   *Matter of Riva*, 12 I. & N. Dec. 56, 58 (Reg. Comm'r 1967).

51.     "The purpose of the Act upon which these applications are based is to provide a ready means to permit certain Cuban refugees in the United States to adjust to permanent resident status," such that a "major objective of this opportunity for adjustment of status was, therefore, to aid in these refugees' resettlement by enhancing their opportunity to qualify for employment here and in turn reduce the Government's expenditures in their behalf."   *Matter of Mesa*, 12 I. & N. Dec. 432, 434–45 (Dep. Assoc. Comm'r 1967) (footnote omitted).

52.     Permanent residence under the Cuban Refugee Adjustment Act is available even where an applicant was paroled after having already physically entered the United States.   *Matter*

*of Rodriguez*, 12 I. & N. Dec. 549 (Reg. Comm. 1967).

53.     These policy goals were in addition to the "very firm goal, a very strong desire that Cuba shall be freed from Communist domination and that the Cuban people will, again, be able to enjoy the benefits of freedom, living in a country which is, once more, a member of the free world family of nations."   H.R. Rep. No. 89-1978, at 4 (1966) (Jud. Comm.) (quoting Under Secretary of State George Ball) (copy at **App. I, Exh. A**, at 5).

54.     In the late 1970s, Congress began work on what would become the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (Mar. 17, 1980), in order "to provide a permanent statute revising U. S. refugee admissions policy" that would supplant the "[p]ast U. S. refugee policy [that] was often categorized as being 'ad hoc,' 'piecemeal,' or 'stopgap' in nature."   Refugee Review, *supra* n. 5, at 35.

55.     However, the current asylum law adopted by the Refugee Act of 1980, 8 U. S. C. §§ 1101(a)(42), 1158, which is generally applicable to any foreign national or stateless person, is much narrower and inadequate when compared to broader refugee laws designed for specific populations of special concern.   See, e. g., *Rocubert-Campo* v. *U. S. Att'y Gen.*, —— F. App'x ——, 2021 WL 3124300 (CA11 July 23, 2021) (affirming denial of Refugee Act asylum to Cuban national who was repeatedly beaten and threatened by government officials due to his political opinion because substantial evidence supported a finding that this did not amount to persecution).

56.     From April through September 1980, approximately 125,000 Cubans fled to the United States during the Mariel boatlift.   Sullivan, *supra* n. 3, at 4.

57.     These exiles were able to obtain status under the Cuban Adjustment Act because they were paroled into the United States.   Cong. Research Serv., *Immigration Parole*, at 8 (Oct.

15, 2020);[7] accord Bruno, *supra* n. 1, at 1 ("In 1980, the INA parole provision was again used when a mass migration of asylum seekers—known as the Mariel Boatlift—brought approximately 125,000 Cubans (and 25,000 Haitians) to South Florida over a six-month period."); see also *Matter of L-T-P-*, 26 I. & N. Dec. 862, 865–67 (BIA 2016) (describing how some "Marielitos" are to be treated as refugees based on having been paroled, while some are not, based on the enactment of the Refugee Act of 1980).

58.    Diplomatic relations later soured, with Cuba being listed as a state sponsor of terrorism, and the reimposition of travel restrictions to Cuba.    Sullivan*, supra* n. 3, at 4.

59.    However, on December 14, 1984, the United States made an agreement (part of the overall Migration Accords) where Cuba would accept "the return to Cuba of approximately 2,700 of the 129,000 persons [from] the Mariel Boatlift of 1980," but the parties were clear that this "d[id] not signal any change in U. S. policy toward Cuba."    (**App. I**, **Exh. B**, at 14.)

60.    Cuba's acceptance of these excluded Cuban nationals allowed, under the law at that time, the United States to "resume normal processing of visas for Cuban applicants which had been conducted in Havana prior to 1980."    (**App. I**, **Exh. B**, at 14.)

61.    Specifically, the agreement allowed for the "issuance of preference immigrant visas to Cuban nationals residing in Cuba up to the number of 20,000 each year."    (**App. I**, **Exh. B**, at 15.)    As for the exclusions, generally, "[t]he returns [were to be] effected at a rate of 100 each calendar month."    (**App. I**, **Exh. B**, at 16.)

62.    But in 1985, the "U. S. government radio broadcasting to Cuba (Radio Marti) began operations in May," and, "[a]s a result, Cuba suspended the 1984 migration agreement with the United States."    Sullivan, *supra* n. 3, at 5.

---

[7] Available at: https://crsreports.congress.gov/product/pdf/R/R46570.

63.     In 1987, a statement was issued announcing that the 1984 Migration Accord would resume anew.   (**App. I**, **Exh. C**, at 23.)

64.     Starting in October 1992, the U. S. embargo on Cuba was tightened through new legislation, leading to violent acts from Cuba (which killed many Cubans fleeing by boat) to forbid its nationals from fleeing to the United States.    Sullivan, *supra* n. 3, at 5–9

65.     On August 15, 1994, in response to disputes with the United States, "[t]he Cuban government stopped preventing Cubans from fleeing to the United States by boat.   The change in Cuban policy led to a surge of migration to the United States, the largest since the Mariel boatlift of 1980."   Sullivan, *supra* n. 3, at 9.

66.     "With escalating numbers of Cubans fleeing to the United States, President Clinton abruptly changed U. S. migration policy toward Cubans and announced that, instead of welcoming Cubans fleeing their island nation, 'illegal refugees from Cuba' would not be allowed to enter the United States," on August 19, 1994.   Sullivan, *supra* n. 3, at 9.   "Instead, the Coast Guard was directed to take refugees rescued at sea to the U.S. naval base at Guantanamo while the Administration explored the possibility of other 'safe haven' nations in the Caribbean Basin region."   *Id.*

67.     Cuba soon came back to the table, and a Joint Communique was issued by the two nations on September 9, 1994.   (**App. I**, **Exh. D**, at 25–26.)

68.     Per the 1994 agreement, "migrants rescued at sea attempting to enter the United States will not be permitted to enter the United States, but instead will be taken to safe haven facilities outside the United States," with the resumption of the United States accepting legal migration from Cuba at a rate of "a minimum of 20,000 Cubans each year, not including immediate relatives of United States citizens."   (**App. I**, **Exh. D**, at 25.)

69.     This new policy of returning Cubans interdicted at sea was a restrictionary measure,

offering lesser refuge to Cuban nationals, and was the start of the "wet-foot/dry-foot policy." Wasem, *supra* n. 2, at 2 ("Until 1995, the United States generally had not repatriated Cubans (except certain criminal aliens on a negotiated list) under a policy established when the government became Communist within two years of the 1959 revolution."); White House Q&A for Jan. 12, 2017 Press Release ("The United States returns or resettles in third countries Cuban nationals who are interdicted at sea attempting to come to our country illegally, as it does with nationals from other countries in the Caribbean.   But for many years, we have had special policies for Cuban nationals who actually reach U.S. territory.   Under longstanding policy, the overwhelming majority of them are granted parole (a form of approved temporary stay) as a matter of discretion.") (**App. I**, **Exh. G**, at 40).

70.    On May 1995, the United States and Cuba issued a Joint Statement doing two important things.   (**App. I**, **Exh. E**, at 28.)

71.    With respect to Cuban nationals that were interdicted and taken to the U. S. base in Guantanamo, the United States agreed to parole them into the United States, while later "Cuban migrants intercepted at sea by the United States and attempting to enter the United States will be taken to Cuba."   (**App. I**, **Exh. E**, at 28); accord *Sullivan*, *supra* n. 3, at 13 ("Under the new accord (which was negotiated outside of the regular rounds of talks reviewing the September accord), the United States would parole those Cubans housed at Guantanamo into the United States, but would intercept future Cuban migrants attempting to enter the United States by sea and would return them to Cuba.").

72.    Effective April 1, 1997, the Congress overhauled many parts of the immigration code with the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, Div. C, Tit. III, Subtit. A, 110 Stat. 3009-546 (Sept. 30, 1996).

73.    One of the new changes was the introduction of the expedited removal procedure

for noncitizens seeking entry into the United States, disallowing them from accessing the full process available before an immigration judge except for limited proceedings related to making a claim for asylum.    § 302(a), IIRIRA (codified at 8 U. S. C. § 1225(b)(1)).

74.    Among the new expedited removal proceedings was a provision that excluded Cuban nationals from its application.    8 U. S. C. § 1225(b)(1)(F) ("Subparagraph (A) shall not apply to an alien who is a native or citizen of a country in the Western Hemisphere with whose government the United States does not have full diplomatic relations and who arrives by aircraft at a port of entry."); see Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 Fed. Reg. 4902, 4903–04 (Jan. 17, 2017) (describing additional exceptions applied to Cuban nationals relating to prior Federal Register notices which expanded the scope of expedited removal).

75.    Section 606(a) of the IRRIRA provided that the Cuban Adjustment Act would remain in force until there is "a determination by the President under section 203(c)(3) of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996 (Public Law 104–114) that a democratically elected government in Cuba is in power."    110 Stat. 3009-695.

76.    The following year, Congress passed an amnesty law that permitted Cubans (among other nationals) who entered without inspection—and were thus ineligible for relief under the Cuban Adjustment Act for lack of admission or parole into the United States—to apply for permanent residence up until April 1, 2000, pursuant to Section 202 of the Nicaraguan and Central American Relief Act (NACARA), Pub. L. No. 105-100, Tit. II, 111 Stat. 2193 (Nov. 19, 1997).

77.    On March 4, 2008, the Chief of the USCIS Office of Field Operations adopted a policy allowing Cubans who had entered without inspection to apply for parole at USCIS Field Offices without threat of detention (**App. I**, **Exh. H**, at 52–53) which was a continuation of a prior

INS policy instituted in 1999 (**App. I**, **Exh. J**, at 62–64).

78.     Since then, Cuban nationals were able to present themselves to immigration officers either within the United States or at a port of entry to request parole in order to qualify for the benefits of the Cuban Refugee Adjustment Act until January of 2017.

79.     On January 12, 2017, the Obama administration issued a Joint Statement with the Cuban government, being the latest iteration of the Migration Accords, declaring that it would end the wet-foot/dry-foot policy, thereby subjecting Cuban nationals to normal removal procedures, and that Cuba would begin accepting removals of Cuban nationals.   (**App. I**, **Exh. F**, at 30–32.)

80.     Five days later, the Secretary of Homeland Security announced that 8 U. S. C. § 1225(1)(F) would no longer be applied to Cuban nationals such that "Cuban nationals encountered on or after January 13, 2017 are included in the classes of aliens subject to expedited removal."   Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 Fed. Reg. 4902, 4904 (Jan. 17, 2017)

81.     Documents obtained through a pending FOIA litigation, *Catholic Charities* v. *Stein*, 20-cv-23846-BLOOM/Louis (S.D. Fla.), demonstrate that the following classes of persons were to be subjected to removal to Cuba:

(a)     Cubans interdicted at sea as had occurred before;

(b)     Cubans who left Cuba following the issuance of the Joint Statement who have been outside of Cuba for no more than 4 years (subject to tolling);

(c)     Other Cubans accepted by the Cuban government on a case-by-case basis;

(d)     Cubans on the 1984 "Mariel List" including an allowance for substitutions of new persons onto the list.

(**App. I**, **Exh. F**, at 33–37.)

82.     However, this agreement has essentially become a failure due to extremely low rates of removal to Cuba, as described by a Department of State Report to Congress on Cuban Compliance with the Migration Accords during October 2020.   (**App. I**, **Exh. K**, at 71–72 (describing: (1) 2,969 removals of post-January 12, 2017, arrivals; (2) 214 removals of Mariel List Cubans, explaining that "Cuba has repeatedly and without justification . . . denied to repatriate 1,264 Cuban nationals" in this category; and (3) that the case-by-case program has been "nearly ineffective" with "[t]he Cuban government approv[ing] only 24 – less than 1 percent – " out of "4,998" requested removals).)

83.     In fact, as demonstrated by documents obtained through the *Catholic Charities* litigation, the Department of State secretly imposed visa sanctions upon Cuban government officials due to Cuba's failure to comply with removal requests.   (**App. I**, **Exh. L**, at 75–79.)

84.     As for the other Semiannual Reports to Congress on Cuban Compliance with the Migration Accords obtained through the *Catholic Charities* case, the last one to report numbers of Cuban nationals arriving at the Southwestern border (the October 2019 report) shows the following numbers:

| Location | FY 2017 Total | FY 2018 Total | FYTD 2019 |
|---|---|---|---|
| SW Ports of Entry | 15,461 | 7,097 | 18,047 |
| SW Between Ports of Entry | 240 | 123 | 9,989 |

(**App. I**, **Exh. M**, at 83.)

## LEGAL FRAMEWORK FOR ENTRY AND DETENTION

85.    Current immigration law provides for substantially different treatment between noncitizens who have been "admitted" to the United States, and those who are "applicants for admission."

86.    "The terms 'admission' and 'admitted' mean, with respect to an alien, the **lawful entry** of the alien into the United States after inspection and authorization by an immigration officer."   8 U. S. C. § 1101(a)(13)(A) (emphasis added).

87.    Aside from being "admitted," a noncitizen may also **lawfully enter** (at least physically) the United States following inspection and authorization through the process of "parole" that is codified at 8 U. S. C. § 1182(d)(5).

88.    But the law expressly distinguishes between these two concepts in that a parole "shall not be regarded as an admission."    § 1182(d)(5)(A); accord § 1101(a)(13)(B) ("An alien who is paroled under section 1182(d)(5) of this title or permitted to land temporarily as an alien crewman shall not be considered to have been admitted.").

89.    This distinction between admission and parole has historical purpose because parole is a method to allow an "inadmissible" noncitizen, who has not been formally admitted to the United States, to be at liberty inside the country for a specific purpose within the agency's discretion.   *Leng May Ma* v. *Barber*, 357 U. S. 185, 190 (1958) ("The parole of aliens seeking admission is simply a device through which needless confinement is avoided while administrative proceedings are conducted.").

90.    Parole is in effect an "enlarge[ment]" from custody.    *Id*., at 189.    It preserves the legal fiction that an "entry" has not occurred.    *Id*., at 188 ("For over a half century this Court has held that the detention of an alien in custody pending determination of his admissibility does not

legally constitute an entry though the alien is physically within the United States.") (citations omitted).

91.     This fiction arises from the "fundamental distinction between excludable aliens and deportable aliens which permeates our immigration law" which leads to, among other specific outcomes, a fiction where "[e]xcludable aliens are those who seek admission but have not been granted entry" and are thus "legally considered detained at the border."   *Garcia-Mir* v. *Smith*, 766 F. 2d 1478, 1483–84 (CA11 1985); see also *Jean* v. *Nelson*, 727 F. 2d 957, 969 (CA11 1984) (en banc) (describing the origins of the "entry doctrine fiction").

92.     Therefore, "parolees" are treated as applicants for admission even though they have been lawfully inspected and authorized to physically enter the United States.   8 U. S. C. § 1182(d)(5)(A) ("[W]hen the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.").

93.     Being admitted brings with it important benefits.   Some benefits overlap with the benefit of being paroled, while others are available only to persons who have been admitted.

94.     Both classes of lawful entrants are treated equally when requesting permanent residence under the Cuban Adjustment Act which is available to Cuban nationals "who ha[ve] been inspected and **admitted or paroled** into the United States."   § 1, CAA, Pub. L. No. 89-732, 80 Stat. 116 (emphasis added).

95.     However, whether a noncitizen has been admitted or paroled into the United States can be a crucial distinction.

96.     An example of disparate treatment is that an admitted person (unlike a parolee) can

only be removed from the United States based on a ground of deportability under 8 U. S. C. § 1227(a), as opposed to a ground of inadmissibility under § 1182(a) which requires a lesser showing to support removal.

97.     In a removal proceeding, an admitted person is afforded greater procedural protections than an applicant for admission.   Compare § 1229a(c)(3), with § 1229a(c)(2).

98.     A parolee, who remains subject to inadmissibility under § 1182(a), is considered an "applicant for admission" under § 1225(a)(1).

99.     Parolees are not the only type of "applicant for admission," as that classification applies to any noncitizen who is "present in the United States without admission or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international of United States waters)." § 1225(a)(1).

100.     When an immigration officer encounters an applicant for admission, they are must "inspect" the applicant for admissibility.   §§ 1225(a)(3), (b).

101.     Where doubts regarding admissibility arise during inspection, the immigration statute provides for two different methods of processing.

102.     Under § 1225(b)(1), which applies to a limited class of noncitizens defined in §§ 1225(b)(1)(A)(i)–(iii), removal is automatic subject to the ability to request asylum in accordance with the procedures in § 1225(b)(1)(B).

103.     Under § 1225(b)(2), which applies to all applicants for admission except those "to whom paragraph (1) applies," § 1225(b)(2)(B)(ii),[8] removal is pursued via full removal

---

[8] Crewman and stowaways are other sub-classes of applicants for admission who are subject other forms of automatic removal.   8 U. S. C. §§ 1225(a)(2), 1282(b), 1284(c).

proceedings as generally used against admitted noncitizens, § 1225(b)(2)(A).

104.    "Both § 1225(b)(1) and § 1225(b)(2) authorize the detention of certain aliens," *Jennings* v. *Rodriguez*, 138 S. Ct. 830, 837 (2018), such that both "§§ 1225(b)(1) and (b)(2) thus **mandate detention** of applicants for admission until certain proceedings have concluded," *id.*, at 842 (emphasis added).   "Until that point, however, nothing in the statutory text imposes any limit on the length of detention."   *Id.*   "And neither § 1225(b)(1) nor § 1225(b)(2) says anything whatsoever about bond hearings."   *Id.*

105.    "The plain meaning of those phrases is that detention must continue until immigration officers have finished 'consider[ing]' the application for asylum, § 1225(b)(1)(B)(ii), or until removal proceedings have concluded, § 1225(b)(2)(A)."   *Id.*, at 844.   "[T]hey unequivocally mandate that aliens falling within their scope 'shall' be detained."   *Id.*

106.    And yet, "[r]egardless of which of those two sections authorizes their detention, applicants for admission may be temporarily released on parole 'for urgent humanitarian reasons or significant public benefit.' "   *Id.*, at 837 (citing § 1182(d)(5)(A); 8 CFR §§ 212.5(b), 235.3 (2017)); accord *id.*, at 844 ("With a few exceptions not relevant here, the Attorney General may 'for urgent humanitarian reasons or significant public benefit' temporarily parole aliens detained under §§ 1225(b)(1) and (b)(2).") (citing § 1182(d)(5)(A)).

107.    In fact, "[t]hat express exception to detention implies that there are no *other* circumstances under which aliens detained under § 1225(b) may be released."   *Id.* (emphasis in original) (citation omitted).

108.    In so holding, the Supreme Court was clear in rejecting the suggestion that bond hearings and conditional parole are available to applicants for admission.   *Id.*, at 845 ("For example, respondents argue that, once detention authority ends under §§ 1225(b)(1) and (b)(2), aliens

can be detained only under § 1226(a).  . . .  To put it lightly, that makes little sense.").

## RELEVANT FACTUAL ALLEGATIONS

### I.    Yaribel Rabelo-Rodriguez

109.    Plaintiff Yaribel Rabelo Rodriguez is a native and citizen of Cuba who applied for admission to the United States at the port of entry at Presidio, Texas on March 2, 2019.    (**App. II**, **Exh. A**, at 16.)

110.    As such, she is considered to be an "arriving alien" as per 8 CFR § 1.2.

111.    She was taken into DHS custody on or about this time.

112.    A notice to appear for removal proceedings was issued against her on March 3, 2019.  (**App. II**, **Exh. A**, at 16–18.)

113.    She was charged as being inadmissible to the United States under 8 U. S. C. § 1182(a)(7)(A)(i)(I).    (**App. II**, **Exh. A**, at 18.)

114.    However, to this day, the notice to appear has never been filed with an immigration court (**App. II**, **Exh. A**, at 19), meaning that removal proceedings have never been commenced in accordance with 8 CFR § 1003.14(a).

115.    On or about March 4, 2019, the DHS released Ms. Rabelo from its custody.    (**App. II**, **Exh. A**, at 12–15.)

116.    In so doing, the DHS purported to release Ms. Rabelo pursuant to 8 U. S. C. § 1226(a) via production of a document labeled "Order of Release of Recognizance."    (**App. II**, **Exh. A**, at 12.)

117.    More than a year after her physical entry, Ms. Rabelo applied for permanent residence under Section 1 of the CAA, Pub. L. No. 89-732, 80 Stat. 1161.

118.    On August 4, 2020, the USCIS National Benefits Center denied her application on

the grounds that she had not demonstrated that she had been paroled into the United States.   (**App. II**, **Exh. A**, at 9–11.)

119.   She thereafter filed a motion to reconsider with a memorandum of law arguing that she had been paroled as a matter of law.   (**App. II**, **Exh. A**, at 4–8.)

120.   On October 2, 2020, the agency denied Ms. Rabelo's motion without a reasoned explanation as to why it disagreed with her legal argument.   (**App. II**, **Exh. A**, at 2–3.)

## II.   Alexis Fernandez-Perez

121.   Plaintiff Alexis Fernandez-Perez is a native and citizen of Cuba who applied for admission to the United States at the port of entry at Presidio, Texas on March 2, 2019.   (**App. II**, **Exh. B**, at 35.)

122.   As such, he is considered to be an "arriving alien" as per 8 CFR § 1.2.

123.   He was taken into DHS custody on or about this time.

124.   A notice to appear for removal proceedings was issued against him on March 3, 2019.   (**App. II**, **Exh. B**, at 35–37.)

125.   He was charged as being inadmissible to the United States under 8 U. S. C. § 1182(a)(7)(A)(i)(I).   (**App. II**, **Exh. B**, at 37.)

126.   However, to this day, the notice to appear has never been filed with an immigration court (**App. II**, **Exh. B**, at 38), meaning that removal proceedings have never been commenced in accordance with 8 CFR § 1003.14(a).

127.   On or about March 4, 2019, the DHS released Mr. Fernandez from its custody. (**App. II**, **Exh. B**, at 31–34.)

128.   In so doing, the DHS purported to release Mr. Fernandez pursuant to 8 U. S. C. § 1226(a) via production of a document labeled "Order of Release of Recognizance."   (**App. II**,

**Exh. B**, at 31.)

129.    More than a year after his physical entry, Mr. Fernandez applied for permanent residence under Section 1 of the CAA, Pub. L. No. 89-732, 80 Stat. 1161.

130.    On August 4, 2020, the USCIS National Benefits Center denied his application on the grounds that he had not demonstrated that he had been paroled into the United States.   (**App. II**, **Exh. B**, at 28–30.)

131.    He thereafter filed a motion to reconsider with a memorandum of law arguing that she had been paroled as a matter of law.   (**App. II**, **Exh. B**, at 23–27.)

132.    On October 2, 2020, the agency denied Mr. Fernandez' motion without a reasoned explanation as to why it disagreed with his legal argument.   (**App. II**, **Exh. B**, at 21–22.)

### III.    A- F-R- (a minor child)

133.    Plaintiff A- F-R- (a minor child) is the child of plaintiffs Yaribel Rabelo-Rodriguez and Alexis Fernandez-Perez.

134.    A- F-R- is a native and citizen of Cuba who applied for admission to the United States at the port of entry at Presidio, Texas on March 2, 2019.   (**App. II**, **Exh. C**, at 54.)

135.    As such, she is considered to be an "arriving alien" as per 8 CFR § 1.2.

136.    She was taken into DHS custody on or about this time.

137.    A notice to appear for removal proceedings was issued against her on March 3, 2019.   (**App. II**, **Exh. C**, at 54–56.)

138.    She was charged as being inadmissible to the United States under 8 U.S.C. § 1182(a)(7)(A)(i)(I).   (**App. II**, **Exh. C**, at 56.)

139.    However, to this day, the notice to appear has never been filed with an immigration court (**App. II**, **Exh. C**, at 57), meaning that removal proceedings have never been commenced in

accordance with 8 CFR § 1003.14(a).

140.    On or about March 4, 2019, the DHS released A- F-R- from its custody.   (**App. II**, **Exh. C**, at 50–53.)

141.    In so doing, the DHS purported to release A- F-R- pursuant to 8 U. S. C. § 1226(a) via production of a document labeled "Order of Release of Recognizance."   (**App. II**, **Exh. C**, at 50.)

142.    More than a year after her physical entry, A- F-R- applied for permanent residence under Section 1 of the CAA, Pub. L. No. 89-732, 80 Stat. 1161.

143.    On August 4, 2020, the USCIS National Benefits Center denied her application on the grounds that she had not demonstrated that she had been paroled into the United States.   (**App. II**, **Exh. C**, at 47–49.)

144.    She thereafter filed a motion to reconsider with a memorandum of law arguing that she had been paroled as a matter of law.   (**App. II**, **Exh. C**, at 42–46.)

145.    On October 2, 2020, the agency denied A- F-R-'s motion without a reasoned explanation as to why it disagreed with her legal argument.   (**App. II**, **Exh. C**, at 40–41.)

### IV.    Adrian Hernandez-Borges

146.    Plaintiff Adrian Hernandez-Borges is a native and citizen of Cuba who applied for admission to the United States at the port of entry at Roma, Texas on March 17, 2019.   (**App. II**, **Exh. D**, at 71.)

147.    As such, he is considered to be an "arriving alien" as per 8 CFR § 1.2.

148.    He was taken into DHS custody on or about this time for purposes of an asylum interview given that he had been placed into expedited removal proceedings.   (**App. II**, **Exh. D**, at 73.)

149.    On April 8, 2019, an asylum officer found that Mr. Hernandez had a credible fear of persecution or torture, thus allowing him to apply for asylum before an immigration judge under 8 U. S. C. §§ 1225(b)(1)(B)(i)–(ii).   (**App. II**, **Exh. D**, at 77.)

150.    Thus, a notice to appear for removal proceedings was issued against him on April 11, 2019.   (**App. II**, **Exh. D**, at 79–80.)

151.    He was charged as being inadmissible to the United States under 8 U. S. C. § 1182(a)(7)(A)(i)(I).   (**App. II**, **Exh. D**, at 79.)

152.    On or about April 13, 2019, the DHS released made the decision to release Mr. Hernandez from its custody upon the posting of a bond.   (**App. II**, **Exh. D**, at 81.)

153.    In so doing, the DHS purported to release Mr. Hernandez pursuant to 8 U. S. C. § 1226(a) via production of a document labeled "Notice of Custody Determination."   (**App. II**, **Exh. D**, at 81.)

154.    Upon information and belief, that notice to appear was never filed with an immigration court, meaning that removal proceedings did not commence in accordance with 8 CFR § 1003.14(a).

155.    On December 23, 2019, Mr. Hernandez affirmatively applied for asylum with USCIS which adjudicates asylum applications when an application in not in removal proceedings before an immigration judge.   (**App. II**, **Exh. D**, at 83.)

156.    On March 4, 2020, the USCIS Miami Asylum Office commenced removal proceedings against Mr. Hernandez through the issuance of a new, superseding notice to appear charging him with inadmissibility under 8 U. S. C. § 1182(a)(7)(A)(i)(I).   (**App. II**, **Exh. D**, at 84–89.)

157.    Although Mr. Hernandez has a case pending with the immigration court, there is no hearing date set for his case.   (**App. II**, **Exh. D**, at 89.)

158.   On September 29, 2020, Mr. Hernandez applied for permanent residence under Section 1 of the CAA, Pub. L. No. 89-732, 80 Stat. 1161.   (**App. II**, **Exh. D**, at 62.)

159.   On January 15, 2021, the USCIS National Benefits Center requested that Mr. Hernandez provide evidence of having been paroled, to which he replied with a memorandum of law arguing that he had been paroled as a matter of law.   (**App. II**, **Exh. D**, at 62–69.)

160.   On April 8, 2021, the USCIS National Benefits Center denied Mr. Hernandez' application on the grounds that he had not demonstrated that he had been paroled into the United States without a reasoned explanation as to why it disagreed with his legal argument.   (**App. II**, **Exh. D**, at 59–61.)

### V.      Rene Caridad Roman-Hernandez

161.   Plaintiff Rene Caridad Roman-Hernandez is a native and citizen of Cuba who applied for admission to the United States at the Ysleta Border Crossing in El Paso, Texas on April 12, 2019.   (**App. II**, **Exh. E**, at 95.)

162.   As such, he is considered to be an "arriving alien" as per 8 CFR § 1.2.

163.   He was taken into DHS custody on or about this time.

164.   A notice to appear for removal proceedings was issued against him on April 14, 2019.   (**App. II**, **Exh. E**, at 95–97.)

165.   He was charged as being inadmissible to the United States under 8 U. S. C. § 1182(a)(7)(A)(i)(I).   (**App. II**, **Exh. E**, at 97.)

166.   On or about April 14, 2019, the DHS released Mr. Roman from its custody.   (**App. II**, **Exh. E**, at 94.)

167.   In so doing, the DHS purported to release Mr. Roman pursuant to 8 U. S. C. § 1226(a) via production of a document labeled "Order of Release of Recognizance."   (**App. II**,

28

**Exh. E**, at 94.)

168.    Although Mr. Roman has a case pending with the immigration court, there is no hearing date set for his case.    (**App. II**, **Exh. E**, at 98.)

169.    More than a year after his physical entry, Mr. Roman applied for permanent residence under Section 1 of the CAA, Pub. L. No. 89-732, 80 Stat. 1161.

170.    On November 4, 2020, the USCIS National Benefits Center denied Mr. Roman's application on the grounds that he had not demonstrated that he had been paroled into the United States without a reasoned explanation as to why it disagreed with his legal argument.    (**App. II**, **Exh. E**, at 91–93.)

### VI.    Marile Pacheco-Chavez

171.    Plaintiff Marile Pacheco-Chavez is a native and citizen of Cuba who applied for admission to the United States at the Ysleta Border Crossing in El Paso, Texas on April 12, 2019. (**App. II**, **Exh. F**, at 104.)

172.    As such, she is considered to be an "arriving alien" as per 8 CFR § 1.2.

173.    She was taken into DHS custody on or about this time.

174.    A notice to appear for removal proceedings was issued against her on April 14, 2019.   (**App. II**, **Exh. F**, at 104–06.)

175.    She was charged as being inadmissible to the United States under 8 U. S. C. § 1182(a)(7)(A)(i)(I).    (**App. II**, **Exh. F**, at 106.)

176.    On or about April 14, 2019, the DHS released Ms. Pacheco from its custody. (**App. II**, **Exh. F**, at 103.)

177.    In so doing, the DHS purported to release Ms. Pacheco pursuant to 8 U. S. C. § 1226(a) via production of a document labeled "Order of Release of Recognizance."    (**App. II**,

**Exh. F**, at 103.)

178.    Although Ms. Pacheco has a case pending with the immigration court, there is no

hearing date set for her case.    (**App. II**, **Exh. F**, at 107.)

179.    More than a year after her physical entry, Ms. Pacheco applied for permanent resi-

dence under Section 1 of the CAA, Pub. L. No. 89-732, 80 Stat. 1161.

180.    On November 4, 2020, the USCIS National Benefits Center denied Ms. Pacheco's

application on the grounds that she had not demonstrated that she had been paroled into the United

States without a reasoned explanation as to why it disagreed with her legal argument.    (**App. II**,

**Exh. F**, at 100–02.)

**VII.    M- K- R-P- (a minor child)**

181.    Plaintiff M- K- R-P- (a minor child) is the child of plaintiffs Rene Caridad Ro-

man-Hernandez and Marile Pacheco-Chavez.

182.     M- K- R-P- is a native and citizen of Cuba who applied for admission to the United

States at the Ysleta Border Crossing in El Paso, Texas on April 12, 2019.    (**App. II**, **Exh. G**, at

113.)

183.    As such, she is considered to be an "arriving alien" as per 8 CFR § 1.2.

184.    She was taken into DHS custody on or about this time.

185.    A notice to appear for removal proceedings was issued against her on April 14,

2019.   (**App. II**, **Exh. G**, at 113–15.)

186.    She was charged as being inadmissible to the United States under 8 U. S. C.

§ 1182(a)(7)(A)(i)(I).    (**App. II**, **Exh. G**, at 115.)

187.    On or about April 14, 2019, the DHS released M- K- R-P- from its custody.    (**App.**

**II**, **Exh. G**, at 112.)

188.     In so doing, the DHS purported to release **Ms. Pacheco** pursuant to 8 U.S.C. § 1226(a) via production of a document labeled "Order of Release of Recognizance."   (**App. II**, **Exh. G**, at 112.)

189.     Although M- K- R-P- has a case pending with the immigration court, there is no hearing date set for her case.   (**App. II**, **Exh. G**, at 116.)

190.     More than a year after her physical entry, M- K- R-P- applied for permanent residence under Section 1 of the CAA, Pub. L. No. 89-732, 80 Stat. 1161.

191.     On November 4, 2020, the USCIS National Benefits Center denied M- K- R-P-'s application on the grounds that she had not demonstrated that she had been paroled into the United States without a reasoned explanation as to why it disagreed with her legal argument.   (**App. II**, **Exh. G**, at 109–11.)

### VIII.   Elaine Martinez-Milanes

192.     Plaintiff Elaine Martinez-Milanes is a native and citizen of Cuba who applied for admission to the United States at the Paso del Norte Port of Entry at El Paso, Texas on November 1, 2018.   (**App. II**, **Exh. H**, at 120.)

193.     As such, she is considered to be an "arriving alien" as per 8 CFR § 1.2.

194.     She was taken into DHS custody on or about this time.

195.     A notice to appear for removal proceedings was issued against her on January 31, 2019.   (**App. II**, **Exh. H**, at 120–22.)

196.     She was charged as being inadmissible to the United States under 8 U.S.C. § 1182(a)(7)(A)(i)(I).   (**App. II**, **Exh. H**, at 22.)

197.     However, to this day, the notice to appear has never been filed with an immigration court (**App. II**, **Exh. H**, at 127), meaning that removal proceedings have never been commenced

in accordance with 8 CFR § 1003.14(a).

198.    On or about March 4, 2019, the DHS released Ms. Martinez from its custody. (**App. II**, **Exh. H**, at 123–26.)

199.    In so doing, the DHS purported to release Ms. Martinez pursuant to 8 U. S. C. § 1226(a) via production of a document labeled "Order of Release of Recognizance."    (**App. II**, **Exh. H**, at 123.)

200.    More than a year after her physical entry, Ms. Martinez applied for permanent residence under Section 1 of the CAA, Pub. L. No. 89-732, 80 Stat. 1161.

201.    On July 2, 2020, the USCIS Jacksonville Field Office denied Ms. Martinez' application on the grounds that she had not demonstrated that she had been paroled into the United States without a reasoned explanation as to why it disagreed with her legal argument.    (**App. II**, **Exh. H**, at 118–19.)

### IX.     Consuelo Izquierdo-Miranda

202.    Plaintiff Consuelo Izquierdo-Miranda is a native and citizen of Cuba who applied for admission to the United States.

203.    She was taken into DHS custody on or about this time.

204.    On or about March 4, 2019, the DHS released Ms. Izquierdo from its custody. (**App. II**, **Exh. I**, at 138–41.)

205.    In so doing, the DHS purported to release Ms. Izquierdo pursuant to 8 U. S. C. § 1226(a) via production of a document labeled "Order of Release of Recognizance."    (**App. II**, **Exh. I**, at 138.)

206.    She is set for a report hearing in the Miami Immigration Court for January 26, 2022. (**App. II**, **Exh. I**, at 142.)

207.     More than a year after her physical entry, Ms. Izquierdo applied for permanent residence under Section 1 of the CAA, Pub. L. No. 89-732, 80 Stat. 1161.

208.     On June 12, 2020, the USCIS National Benefits Center requested that Ms. Izquierdo provide evidence of having been paroled, to which she replied with a memorandum of law arguing that she had been paroled as a matter of law.   (**App. II**, **Exh. I**, at 132–37.)

209.     On September 11, 2020, the USCIS National Benefits Center denied Ms. Izquierdo's application on the grounds that she had not demonstrated that she had been paroled into the United States without a reasoned explanation as to why it disagreed with her legal argument.   (**App. II**, **Exh. I**, at 129–31.)

## X.     Yanara Mendoza-Cintra

210.     Plaintiff Yanara Mendoza-Cintra is a native and citizen of Cuba who applied for admission to the United States.

211.     She was taken into DHS custody on or about this time.

212.     On or about March 29, 2019, the DHS released Ms. Mendoza from its custody. (**App. II**, **Exh. J**, at 147–51.)

213.     In so doing, the DHS purported to release Ms. Mendoza pursuant to 8 U. S. C. § 1226(a) via production of a document labeled "Order of Release of Recognizance."   (**App. II**, **Exh. J**, at 147.)

214.     To this day, a notice to appear has never been filed with an immigration court (**App. II**, **Exh. J**, at 152), meaning that removal proceedings have never been commenced in accordance with 8 CFR § 1003.14(a).)

215.     More than a year after her physical entry, Ms. Mendoza applied for permanent residence under Section 1 of the CAA, Pub. L. No. 89-732, 80 Stat. 1161.

216.    On February 9, 2021, the USCIS Royal Palm Beach Field Office denied Ms. Mendoza's application on the grounds that she had not demonstrated that she had been paroled into the United States without a reasoned explanation as to why it disagreed with her legal argument. (**App. II**, **Exh. J**, at 144–46.)

## XI.    A- K- R-M- (a minor child)

217.    Plaintiff A- K- R-M- (a minor child) is the child of plaintiff Yanara Mendoza-Cintra.

218.    A- K- R-M- is a native and citizen of Cuba who applied for admission to the United States.

219.    She was taken into DHS custody on or about this time.

220.    On or about March 29, 2019, the DHS released A- K- R-M- from its custody. (**App. II**, **Exh. K**, at 157–58.)

221.    In so doing, the DHS purported to release A- K- R-M- pursuant to 8 U. S. C. § 1226(a) via production of a document labeled "Order of Release of Recognizance."   (**App. II**, **Exh. K**, at 157.)

222.    To this day, a notice to appear has never been filed with an immigration court (**App. II**, **Exh. K**, at 159), meaning that removal proceedings have never been commenced in accordance with 8 CFR § 1003.14(a).)

223.    More than a year after her physical entry, A- K- R-M- applied for permanent residence under Section 1 of the CAA, Pub. L. No. 89-732, 80 Stat. 1161.

224.    On February 9, 2021, the USCIS Royal Palm Beach Field Office denied A- K- R-M-'s application on the grounds that she had not demonstrated that she had been paroled into the United States without a reasoned explanation as to why it disagreed with her legal argument.

(**App. II**, **Exh. K**, at 154–56.)

### XII.   Ivonne Gutierrez-Moll

225.    Plaintiff Ivonne Gutierrez-Moll is a native and citizen of Cuba who applied for admission to the United States.

226.    She was taken into DHS custody on or about this time.

227.    On or about October 17, 2018, the DHS released Ms. Gutierrez from its custody. (**App. II**, **Exh. L**, at 164–67.)

228.    In so doing, the DHS purported to release Ms. Gutierrez pursuant to 8 U.S.C. § 1226(a) via production of a document labeled "Order of Release of Recognizance."   (**App. II**, **Exh. L**, at 164.)

229.    To this day, a notice to appear has never been filed with an immigration court (**App. II**, **Exh. L**, at 168), meaning that removal proceedings have never been commenced in accordance with 8 CFR § 1003.14(a).)

230.    More than a year after her physical entry, Ms. Gutierrez applied for permanent residence under Section 1 of the CAA, Pub. L. No. 89-732, 80 Stat. 1161.

231.    On May 21, 2020, the USCIS Oakland Park Field Office denied Ms. Gutierrez' application on the grounds that she had not demonstrated that she had been paroled into the United States without a reasoned explanation as to why it disagreed with her legal argument.   (**App. II**, **Exh. L**, at 161–63.)

### XIII.   Adelmis Reve-Marquez

232.    Plaintiff Adelmis Reve-Marquez is a native and citizen of Cuba who applied for admission to the United States.

233.    She was taken into DHS custody on or about this time.

234.    On or about August 1, 2019, the DHS released Ms. Reve from its custody.   (**App. II**, **Exh. M**, at 174–77.)

235.    In so doing, the DHS purported to release Ms. Reve pursuant to 8 U. S. C. § 1226(a) via production of a document labeled "Order of Release of Recognizance."   (**App. II**, **Exh. M**, at 174.)

236.    To this day, a notice to appear has never been filed with an immigration court (**App. II**, **Exh. M**, at 178), meaning that removal proceedings have never been commenced in accordance with 8 CFR § 1003.14(a).)

237.    More than a year after her physical entry, Ms. Reve applied for permanent residence under Section 1 of the CAA, Pub. L. No. 89-732, 80 Stat. 1161.

238.    On June 10, 2021, the USCIS National Benefits Center requested that Ms. Reve provide evidence of having been paroled.   (**App. II**, **Exh. M**, at 172–73.)

239.    On August 20, 2021, the USCIS National Benefits Center denied Ms. Reve's application on the grounds that she had not demonstrated that she had been paroled into the United States without a reasoned explanation as to why it disagreed with her legal argument.   (**App. II**, **Exh. M**, at 170–71.)

### XIV.   Celia Natividad Gonzalez-Garcia

240.    Plaintiff Celia Natividad Gonzalez-Garcia is a native and citizen of Cuba who applied for admission to the United States at the port of entry at Calexico, California on April 15, 2019.   (**App. II**, **Exh. N**, at 185.)

241.    As such, she is considered to be an "arriving alien" as per 8 CFR § 1.2.

242.    She was taken into DHS custody on or about this time.

243.    A notice to appear for removal proceedings was issued against her on May 7, 2019,

after an asylum officer found her to have demonstrated a credible fear of persecution or torture. (**App. II**, **Exh. N**, at 185–86.)

244.    She was charged as being inadmissible to the United States under 8 U. S. C. § 1182(a)(7)(A)(i)(I).    (**App. II**, **Exh. N**, at 185.)

245.    She is set for a report hearing in the Houston, Texas Immigration Court for October 5, 2021.   (**App. II**, **Exh. N**, at 187.)

246.    On May 9, 2019, the DHS served Ms. Gonzalez with a notice that she would receive a parole interview on May 24, 2019.   ( **App. II**, **Exh. N**, at 182–83.)

247.    On or about May 17, 2019, the DHS released Ms. Gonzalez from its custody. (**App. II**, **Exh. N**, at 184.)

248.    More than a year after her physical entry, Ms. Gonzalez applied for permanent residence under Section 1 of the CAA, Pub. L. No. 89-732, 80 Stat. 1161.

249.    On October 23, 2020, the USCIS Houston Field Office denied Ms. Gonzalez' application.   (**App. II**, **Exh. N**, at 180–81.)

### XV.    Isis de la Caridad Silveira-Lozada

250.    Plaintiff Isis de la Caridad Silveira-Lozada is a native and citizen of Cuba who applied for admission to the United States at the Paso del Norte Port of Entry at El Paso, Texas on February 27, 2019.    (**App. II**, **Exh. O**, at 214.)

251.    As such, she is considered to be an "arriving alien" as per 8 CFR § 1.2.

252.    She was taken into DHS custody on or about this time.

253.    On or about February 28, 2019, the DHS released Ms. Silveira from its custody. (**App. II**, **Exh. O**, at 210–13.)

254.    In so doing, the DHS purported to release Ms. Silveira pursuant to 8 U. S. C.

§ 1226(a) via production of a document labeled "Order of Release of Recognizance."   (**App. II**, **Exh. O**, at 210.)

255.   A notice to appear for removal proceedings was issued against her almost a year later on February 26, 2020.   (**App. II**, **Exh. O**, at 214–16.)

256.   She was charged as being inadmissible to the United States under 8 U. S. C. § 1182(a)(7)(A)(i)(I).   (**App. II**, **Exh. O**, at 216.)

257.   She is set for a report hearing in the Dallas, Texas Immigration Court for January 27, 2022.   (**App. II**, **Exh. O**, at 217.)

258.   More than a year after her physical entry, Ms. Silveira applied for permanent residence under Section 1 of the CAA, Pub. L. No. 89-732, 80 Stat. 1161.

259.   On October 13, 2020, the USCIS Irving Field Office denied her application on the grounds that she had not demonstrated that she had been paroled into the United States.   (**App. II**, **Exh. O**, at 207–09.)

260.   She thereafter filed a motion to reconsider with a memorandum of law arguing that she had been paroled as a matter of law.   (**App. II**, **Exh. O**, at 202–06.)

261.   On February 22, 2021, the agency denied Ms. Silveira's motion without a reasoned explanation as to why it disagreed with her legal argument.   (**App. II**, **Exh. O**, at 199–201.)

### XVI.   Ivonne Leyva-Mendez

262.   Plaintiff Ivonne Leyva-Mendez is a native and citizen of Cuba who applied for admission to the United States.

263.   She was taken into DHS custody on or about this time.

264.   On or about April 24, 2019, the DHS released Ms. Leyva from its custody.   (**App. II**, **Exh. P**, at 229–32.)

265.    In so doing, the DHS purported to release Ms. Leyva pursuant to 8 U. S. C. § 1226(a) via production of a document labeled "Order of Release of Recognizance."    (**App. II**, **Exh. P**, at 229.)

266.    To this day, a notice to appear has never been filed with an immigration court (**App. II**, **Exh. P**, at 233), meaning that removal proceedings have never been commenced in accordance with 8 CFR § 1003.14(a).)

267.    More than a year after her physical entry, Ms. Leyva applied for permanent residence under Section 1 of the CAA, Pub. L. No. 89-732, 80 Stat. 1161.

268.    On July 21, 2020, the USCIS National Benefits Center requested that Ms. Leyva provide evidence of having been paroled, to which she replied with a memorandum of law arguing that she had been paroled as a matter of law.    (**App. II**, **Exh. P**, at 223–28.)

269.    On January 25, 2021, the USCIS Las Vegas Field Office denied Ms. Leyva's application on the grounds that she had not demonstrated that she had been paroled into the United States without a reasoned explanation as to why it disagreed with her legal argument.    (**App. II**, **Exh. P**, at 219–22.)

### XVII.   Lesmy Ledesma-Beltran

270.    Plaintiff Lesmy Ledesma-Beltran is the adult daughter of plaintiff Ivonne Leyva-Mendez.

271.    Lesmy Ledesma-Beltran is a native and citizen of Cuba who applied for admission to the United States at the port of entry at Presidio, Texas on April 23, 2019.    (**App. II**, **Exh. Q**, at 243.)

272.    As such, she is considered to be an "arriving alien" as per 8 CFR § 1.2.

273.    She was taken into DHS custody on or about this time.

274.    A notice to appear for removal proceedings was issued against her on April 23, 2019.   (**App. II**, **Exh. Q**, at 243.)

275.    However, to this day, the notice to appear has never been filed with an immigration court (**App. II**, **Exh. Q**, at 244), meaning that removal proceedings have never been commenced in accordance with 8 CFR § 1003.14(a).

276.    On or about April 24, 2019, the DHS released Ms. Ledesma from its custody. (**App. II**, **Exh. Q**, at 239–42.)

277.    In so doing, the DHS purported to release Ms. Ledesma pursuant to 8 U. S. C. § 1226(a) via production of a document labeled "Order of Release of Recognizance."   (**App. II**, **Exh. Q**, at 239.)

278.    More than a year after her physical entry, Ms. Ledesma applied for permanent residence under Section 1 of the CAA, Pub. L. No. 89-732, 80 Stat. 1161.

279.    On July 21, 2020, USCIS requested that Ms. Leyva provide evidence of having been paroled, to which she replied with a memorandum of law arguing that she had been paroled as a matter of law.   (**App. II**, **Exh. Q**, at 235–36.)

280.    On January 25, 2021, the USCIS Las Vegas Field Office denied Ms. Leyva's application on the grounds that she had not demonstrated that she had been paroled into the United States without a reasoned explanation as to why it disagreed with her legal argument.   (**App. II**, **Exh. Q**, at 235–38.)

### XVIII. E- L-L- (a minor child)

281.    Plaintiff E- L-L- (a minor child) is the minor child of plaintiff Lesmy Ledesma-Beltran and granddaughter of plaintiff Ivonne Leyva-Mendez.

282.    E- L-L- (a minor child) is a native and citizen of Cuba who applied for admission

to the United States at the port of entry at Presidio, Texas on April 23, 2019.   (**App. II**, **Exh. R**, at 254.)

283.    As such, she is considered to be an "arriving alien" as per 8 CFR § 1.2.

284.    She was taken into DHS custody on or about this time.

285.    A notice to appear for removal proceedings was issued against her on April 23, 2019.   (**App. II**, **Exh. R**, at 254.)

286.    However, to this day, the notice to appear has never been filed with an immigration court (**App. II**, **Exh. R**, at 255), meaning that removal proceedings have never been commenced in accordance with 8 CFR § 1003.14(a).

287.    On or about April 24, 2019, the DHS released E- L-L- from its custody.   (**App. II**, **Exh. R**, at 250–53.)

288.    In so doing, the DHS purported to release E- L-L- pursuant to 8 U. S. C. § 1226(a) via production of a document labeled "Order of Release of Recognizance."   (**App. II**, **Exh. R**, at 250.)

289.    More than a year after her physical entry, E- L-L- applied for permanent residence under Section 1 of the CAA, Pub. L. No. 89-732, 80 Stat. 1161.

290.    On July 21, 2020, USCIS requested that E- L-L- provide evidence of having been paroled, to which she replied with a memorandum of law arguing that she had been paroled as a matter of law.   (**App. II**, **Exh. R**, at 246–47.)

291.    On January 25, 2021, the USCIS Las Vegas Field Office denied E- L-L-'s application on the grounds that she had not demonstrated that she had been paroled into the United States without a reasoned explanation as to why it disagreed with her legal argument.   (**App. II**, **Exh. R**, at 246–49.)

### XIX.   L- L-L- (a minor child)

292.    Plaintiff L- L-L- (a minor child) is the minor child of plaintiff Lesmy Ledesma-Beltran and granddaughter of plaintiff Ivonne Leyva-Mendez.

293.    L- L-L- (a minor child) is a native and citizen of Cuba who applied for admission to the United States at the port of entry at Presidio, Texas on April 23, 2019.    (**App. II**, **Exh. S**, at 265.)

294.    As such, she is considered to be an "arriving alien" as per 8 CFR § 1.2.

295.    She was taken into DHS custody on or about this time.

296.    A notice to appear for removal proceedings was issued against her on April 23, 2019.   (**App. II**, **Exh. S**, at 265.)

297.    However, to this day, the notice to appear has never been filed with an immigration court (**App. II**, **Exh. S**, at 266), meaning that removal proceedings have never been commenced in accordance with 8 CFR § 1003.14(a).

298.    On or about April 24, 2019, the DHS released L- L-L-from its custody.   (**App. II**, **Exh. S**, at 261–64.)

299.    In so doing, the DHS purported to release L- L-L- pursuant to 8 U. S. C. § 1226(a) via production of a document labeled "Order of Release of Recognizance."   (**App. II**, **Exh. S**, at 261.)

300.    More than a year after her physical entry, L- L-L- applied for permanent residence under Section 1 of the CAA, Pub. L. No. 89-732, 80 Stat. 1161.

301.    On July 21, 2020, USCIS requested that L- L-L- provide evidence of having been paroled, to which she replied with a memorandum of law arguing that she had been paroled as a matter of law.   (**App. II**, **Exh. S**, at 257–58.)

302.    On January 25, 2021, the USCIS Las Vegas Field Office denied L- L-L-'s application on the grounds that she had not demonstrated that she had been paroled into the United States without a reasoned explanation as to why it disagreed with her legal argument.   (**App. II**, **Exh. S**, at 257–60.)

### XX.    Yerennis Rondon-Hernandez

303.    Plaintiff Yerennis Rondon-Hernandez is a native and citizen of Cuba who applied for admission to the United States at the port of entry at Laredo, Texas on September 3, 2018. (**App. II**, **Exh. T**, at 271.)

304.    As such, she is considered to be an "arriving alien" as per 8 CFR § 1.2.

305.    She was taken into DHS custody on or about this time.

306.    A notice to appear for removal proceedings was issued against her on October 15, 2018, after an asylum officer found her to have demonstrated a credible fear of persecution or torture.   (**App. II**, **Exh. T**, at 271–72.)

307.    She was charged as being inadmissible to the United States under 8 U. S. C. § 1182(a)(7)(A)(i)(I).   (**App. II**, **Exh. T**, at 271.)

308.    She is set for a report hearing in the Omaha, Nebraska Immigration Court for October 17, 2024.   (**App. II**, **Exh. T**, at 273.)

309.    On or about January 22, 2019, the DHS released Ms. Rondon from its custody. (**App. II**, **Exh. T**, at 269.)

310.    In so doing, the DHS purported to release Ms. Rondon pursuant to 8 U. S. C. § 1226(a) via production of a document labeled "Order of Release of Recognizance."   (**App. II**, **Exh. T**, at 269.)

311.    More than a year after her physical entry, Ms. Rondon applied for permanent

residence under Section 1 of the CAA, Pub. L. No. 89-732, 80 Stat. 1161.

312.    On September 21, 2020, USCIS requested that Ms. Rondon provide evidence of having been paroled, to which she replied with a memorandum of law arguing that she had been paroled as a matter of law.   (**App. II**, **Exh. T**, at 268–69.)

313.    On February 4, 2021, the USCIS Omaha Field Office denied Ms. Rondon's application on the grounds that she had not demonstrated that she had been paroled into the United States without a reasoned explanation as to why it disagreed with her legal argument.   (**App. II**, **Exh. T**, at 268–70.)

### XXI.    Jesus Rios-Garcia

314.    Plaintiff Jesus Rios-Garcia is a native and citizen of Cuba who applied for admission to the United States at the port of entry at Laredo, Texas on October 2, 2018.   (**App. II**, **Exh. U**, at 284.)

315.    As such, he is considered to be an "arriving alien" as per 8 CFR § 1.2.

316.    He was taken into DHS custody on or about this time.

317.    A notice to appear for removal proceedings was issued against him on November 16, 2018.   (**App. II**, **Exh. U**, at 284.)

318.    He was charged as being inadmissible to the United States under 8 U. S. C. § 1182(a)(7)(A)(i)(I).   (**App. II**, **Exh. U**, at 284.)

319.    He is set for a report hearing in the Fort Snelling, Minnesota Immigration Court for March 1, 2022.   (**App. II**, **Exh. U**, at 285.)

320.    On or about December 21, 2018, the DHS released Mr. Rios from its custody. (**App. II**, **Exh. U**, at 278–82.)

321.    In so doing, the DHS purported to release Mr. Rios pursuant to 8 U. S. C. § 1226(a)

via production of a document labeled "Order of Release of Recognizance."   (**App. II**, **Exh. U**, at 278.)

322.    More than a year after his physical entry, Mr. Rios applied for permanent residence under Section 1 of the CAA, Pub. L. No. 89-732, 80 Stat. 1161.

323.    On January 21, 2020, USCIS requested that Mr. Rios provide evidence of having been paroled.   (**App. II**, **Exh. T**, at 275.)

324.    On June 22, 2020, USCIS gave notice of its intent to deny Mr. Rios' application, to which he replied with a memorandum of law arguing that he had been paroled as a matter of law. (**App. II**, **Exh. T**, at 276.)

325.    On August 18, 2020, the USCIS Minneapolis Field Office denied Mr. Rios' application on the grounds that he had not demonstrated that he had been paroled into the United States without a reasoned explanation as to why it disagreed with his legal argument.   (**App. II**, **Exh. T**, at 275–77.)

## ALLEGATIONS OF LEGAL ERROR

326.    The agency has committed legal error for two reasons: (1) the immigration statutes, as interpreted by the Supreme Court in *Jennings* v. *Rodriguez*, 138 S. Ct. 830 (2018), mandate that an inadmissible applicant for admission may only be released from DHS custody pursuant to the parole authorized established by 8 U. S. C. § 1182(d)(5); and (2) it erred by failing to give reasoned consideration to the plaintiffs' arguments made in reliance upon *Jennings* v. *Rodriguez*.

327.    First, the fact that the plaintiffs (and the putative class which they wish to represent) were inadmissible applicants for admission released from DHS custody establishes that they have been paroled as a matter of law.   Therefore, they were eligible for adjustment of status under Section 1 of the Cuban Refugee Adjustment Act.

328.     Courts of Appeals and the Board of Immigration Appeals have long held in prece-

dential decisions that substance governs over form to determine whether a person has been paroled

or not.     *Vitale* v. *INS*, 463 F. 2d 579 (CA7 1972); *Medina Fernandez* v. *Hartman*, 260 F. 2d 569

(CA9 1958); *Matter of O-*, 16 I. & N. Dec. 344 (BIA 1977).

329.     Prior to replacement of the exclusion regime with the modern inadmissibility re-

gime, it was long understood that applicants for admission were subject to mandatory detention

but for the sole exception in cases involving the exercise of the parole authority under 8 U. S. C.

§ 1182(d)(5).     *Louis* v. *Nelson*, 544 F. Supp. 973, 994 (S.D. Fla. 1982) ("section 212(d)(5) gives

the Attorney General the power to release excludable aliens on parole"); *Jean* v. *Nelson* (*Jean I*),

711 F. 2d 1455, 1468–69 (CA11 1983) (noting adoption of parole policy because the "policy of

mass detention was inhumane and unnecessary"); *Jean II*, 727 F. 2d 957, 977 (CA11 1984) (en

banc) (treating parole as the "obverse" of detention required by former §1225(b)); *Jean* v. *Nelson*

(*Jean III*), 472 U. S. 826, 848–49 (1985) (same); *Matter of Sanchez-Avila*, 21 I. & N. Dec., 444,

458 (BIA 1996) (en banc) ("The 'harshness' of this custody requirement, however, is ameliorated

by the parole provisions of section 212(d)(5)."); 8 U. S. C. § 1225(b) (1994) ("Every alien . . . who

may not appear to the examining immigration officer at the port of arrival to be clearly and beyond

a doubt entitled to land **shall be detained** for further inquiry to be conducted by a special inquiry

officer.") (emphasis added).

330.     Parole is not some sort of special immigration benefit or status.     "The parole of

aliens seeking admission is simply a device through which needless confinement is avoided while

administrative proceedings are conducted."     *Leng May Ma* v. *Barber*, 357 U. S. 185, 190 (1958).

331.     When Congress moved towards the inadmissibility regime in the mid-1990s, it did

so with the intent of expanding this framework to also include immigrants who entered by evading

inspection, reclassifying them as "applicants for admission."   H.R. Conf. Rep. No. 104-828, at 208 (Sept. 24, 1996) ("The current category of persons who are deportable because they have made an entry without inspection will, under the amendments made by section 301(c) of this bill, instead be considered inadmissible under revised paragraph (6)(A) of subsection 212(a)."); AEDPA § 414(a), Pub. L. No. 104-132, 110 Stat. 1214, 1270 (1996) ("an alien found in the United States who has not been admitted to the United States after inspection in accordance with section 235 is **deemed for purposes of this Act to be seeking entry and admission** to the United States and shall be subject to examination and exclusion") (emphasis added); H.R. Conf. Rep. No. 104-518, at 117 (Apr. 15, 1996) ("This section by operation of law, returns 'to the border' any alien who has entered the United States unlawfully, regardless of the duration of his or her presence in the United States.").

332.    Several habeas courts around the country understand that 8 U. S. C. §§ 1225(b)(1) and (b)(2) mandate detention subject only to parole under § 1182(d)(5).   E. g., *Jamal A.* v. *Whitaker*, 358 F. Supp. 3d 853, 857 n. 2 (D. Minn. 2019) ("Although ICE claimed to have detained Jamal under 8 U.S.C. § 1226(c), *see* ECF No. 8 at 2, both parties agree that his detention is instead governed by § 1225(b)(2)(A), ECF No. 1 at 1 n.1; ECF No. 7 at 4."); accord Darrow, J. et al., *Immigration Detention: Emerging Issues Concerning Arriving Aliens, Criminal and Terrorist Aliens, and Hard-to-Remove Aliens*, 65 U. S. Attorneys' Bulletin 70–71, July (I) 2017.[9]

333.    And yet, in 2007, the DHS Office of the General Counsel adopted an internal non-public policy turning this longstanding and well-understood statutory scheme on its head by claiming that it could choose to release an applicant for admission from custody, at its own discretion, under either the parole authority of 8 U. S. C. § 1182(d)(5) or the conditional parole authority

---

[9] Available at: https://www.justice.gov/usao/page/file/984701/download.

which is available to cases subject to § 1226(a) procedures.   (**App. I**, **Exh. N**, at 90–99); compare *In re Applicant*, 2004 WL 3456026, at \*2 (AAO Feb. 11, 2004) (describing prior policy: "[I]f the Service releases from custody an alien who is an applicant for admission because the alien is present in the United States without having been admitted, the alien has been paroled.   This conclusion applies even if the Service officer who authorized the release thought there was a legal distinction between paroling an applicant for admission and releasing an applicant for admission under section 236."); *In re Applicant*, 2004 WL 3455973, at \*2 (AAO Feb. 6, 2004) (same); *In re Applicant*, 2004 WL 3457036, at \*2 (AAO Oct. 21, 2004) (same); *id*. ("In the present case the applicant approached Boarder [sic] Patrol Agents and requested political asylum.   The applicant was taken into custody but was subsequently released from Service custody pending a final determination of his admissibility.   Therefore, pursuant to the Commissioner's policy, the applicant has been paroled."); *In re Applicant*, 2000 WL 33539216, at \*2 (AAO Mar. 22, 2000) (describing prior policy); *In re Applicant*, 2004 WL 3455975, at \*2 (AAO Feb. 6, 2004) (same); *In re Applicant*, 2004 WL 3456919, at \*2 (AAO May 7, 2004) (same); *In re Applicant*, 2006 WL 4739186, at \*2 (AAO Aug. 28, 2006) (same).[10]

334.   But, since the Supreme Court decided the case of *Jennings* v. *Rodriguez*, this relatively new policy from DHS can no longer stand.   138 S. Ct., at 845 (rejecting argument that "once detention authority ends under §§ 1225(b)(1) and (b)(2), aliens can be detained only under § 1226(a)"); see also *id*., at 870–72, & 874–74 (arguing that "§ 1226(a)(2)(A)" works together with §§ 1225(b)(1) and (2) to allow release for persons subject to § 1225 without the need for a § 1182(d)(5) parole) (Breyer, J., dissenting).

335.   In fact, this issue has been bubbling up in the immigration courts, with at least three

---

[10] Many other similar cases are available on WestLaw.

immigration judges agreeing in writing that an applicant for admission released from DHS custody must have been paroled under 8 U. S. C. § 1182(d)(5), and are thus eligible for adjustment of status. *Matter of D-G-*, A –019 (IJ Jan. 4, 2021) (Miami, Fla.) (Cole, IJ) (copy at **App. I**, **Exh. O**, at 101–59), *Matter of S-V-*, A —— (IJ Feb. 23, 2021) (Miami, Fla.) (Burgess, IJ) (copy at **App. I**, **Exh. P**, at 161–68), *Matter of H-A-*, A —538 (IJ Apr. 26, 2021) (Houston, Tex.) (Schumann, IJ) (copy at **App. I**, **Exh. Q**, at 170–74).

336.     Second, the agency has erred by failing to give meaningful consideration to the arguments of the plaintiffs (and the putative class which they wish to represent) which are based on *Jennings* v. *Rodriguez*.

337.     An agency "must consider the issues raised and announce decision in terms sufficient to enable a reviewing court to perceive that [it] has heard and thought and not merely reacted."  *Bing Quan Lin* v. *U. S. Att'y Gen.*, 881 F. 3d 860, 869–70 (CA11 2018) (cleaned up with alteration added).

338.     "Ultimately, the agency does not give reasoned consideration to a claim when it misstates the contents of the record, fails to adequately explain its rejection of logical conclusions, or provides justifications for its decision which are unreasonable and which do not respond to any arguments in the record."  *Bing Quan Lin*, 881 F. 3d, at 874 (quoting *Jeune* v. *U. S. Att'y Gen.*, 810 F. 3d 792, 803 (CA11 2016)).

339.     The plaintiffs (and the putative class which they wish to represent) raised claims based upon *Jennings* v. *Rodriguez*.

340.     But the agency denied their claims without any engagement with their *Jennings*-based arguments, giving zero analysis or at most relying on outdated authorities and quotes from

(and often without citation to) 7 USCIS Policy Manual Part B, Ch. 2, § A(3) n. 50.[11]

341.    Therefore, the agency's failure to meaningfully engage with the *Jennings*-based argument is in itself an error of law.   *Bing Quan Lin*, 881 F. 3d, at 872 ("An assertion that the agency failed to give reasoned consideration to an issue is a question of law that we review de novo.") (cleaned up).

## CLASS ALLEGATIONS

342.    Plaintiffs bring this action for themselves, and as a class on behalf of other similarly situated persons pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2), and hereby propose the following class:

> All Cuban nationals:
>
> (1) who are "applicants for admission" under 8 U. S. C. § 1225(a)(1) that were not admitted into the United States in accordance with § 1101(a)(13)(A);
>
> (2) who were enlarged or released from DHS custody into the United States after January 12, 2017;
>
> (3) prior to the completion of proceedings contemplated by either 8 U. S. C. §§ 1225(b)(1) or (b)(2); and
>
> (4) who applied for adjustment of status under the Cuban Refugee Adjustment Act of 1966 (CAA), Pub. L. No. 89-732, 80 Stat. 1161 (as amended), with U. S. Citizenship and Immigration Services (USCIS), but were denied that relief on the grounds that they did not demonstrate that they had been "inspected and admitted or paroled into the United States."

343.    The proposed class is adequately defined and readily ascertainable from objective criteria.   *Little* v. *T-Mobile USA, Inc.*, 691 F. 3d 1302, 1304 (CA11 2012).

344.    **Numerosity**: The proposed class meets the requirements of Fed. R. Civ. P. 23(a)(1) because it is so numerous that joinder would be impracticable.

---

[11] Available at: https://www.uscis.gov/policy-manual/volume-7-part-b-chapter-2#footnote-link-50

345.    Here, twenty-one plaintiffs have brought the instant action on behalf of themselves and the proposed class.

346.    As per a report submitted to Congress by the Department of State in October 2019, at least 50, 957 Cuban nationals were apprehended by CBP since the start of fiscal year 2017 at or between ports of entry along the southwest land border alone.   (**App. I**, **Exh. M**, at 83.)

347.    That report demonstrates that, between fiscal-year-to-date 2018 and fiscal-year-to-date 2019, there was an increase of apprehensions along the southwest land border by 232% at ports of entry and by 9,324% between ports of entry.   (**App. I**, **Exh. M**, at 83.)

348.    The later reports to Congress obtained through the litigation in *Catholic Charities* v. *Stein*, 20-cv-23846-BLOOM/Louis (S.D. Fla.), did not contain newer information about apprehensions of Cuban nationals.

349.    Presumably, more Cuban nationals have been apprehended since October 2019.

350.    The issues raised by the plaintiffs have also been raised by Cuban nationals in removal proceedings before the immigration courts in those cases where jurisdiction over the adjustment application lies before the immigration court.   (**App. I**, **Exhs. O**–**Q**); also, compare 8 CFR § 245.2(a)(1), with § 1245.2(a)(1) (jurisdictional rules).

351.    As one immigration judge stated, "the Court believes the numbers [of individuals like the plaintiffs] is high."   (**App. I**, **Exh. O**, at 123.)

352.    While the true number of potential class members cannot be readily determined without further discovery from the agency, the class is sufficiently numerous.   *Ibrahim* v. *Acosta*, 326 F.R.D. 696, 699 (S.D. Fla. 2018) ("While there is no fixed rule, generally a class size less than twenty-one is inadequate, while a class size of more than forty is adequate.") (citations omitted).

353.   **Commonality**: The proposed class meets the requirements of Fed. R. Civ. Pro. 23(a)(2) because class members share common issues of law and fact.

354.   Here, each plaintiff is a Cuban national, and each is:

(1) an "applicant for admission" under 8 U. S. C. § 1225(a)(1) who was not admitted into the United States in accordance with § 1101(a)(13)(A);

(2) who was enlarged or released from DHS custody into the United States after January 12, 2017;

(3) prior to the completion of proceedings contemplated by either 8 U. S. C. §§ 1225(b)(1) or (b)(2); and

(4) who applied for adjustment of status under the Cuban Refugee Adjustment Act of 1966 (CAA), Pub. L. No. 89-732, 80 Stat. 1161 (as amended), with U. S. Citizenship and Immigration Services (USCIS), but was denied that relief on the grounds that they did not demonstrate that they had been "inspected and admitted or paroled into the United States."

355.   The common issue of law is whether their release or enlargement from DHS custody amounts to a parole under 8 U. S. C. § 1182(d)(5) as a matter of law.

356.   **Typicality**: The requirements of Fed. R. Civ. P. 23(a)(3) are satisfied because the plaintiffs' claims are typical of those of the proposed class a whole.

357.   The plaintiff's claims are typical of the proposed class because they are in the same factual and procedural posture, have suffered the same injury from the same defendant because of the same legal conclusion made by the defendant (denial of permanent residence under the Cuban Refugee Adjustment Act), and their injuries can be remedied by the same relief requested herein.

358.   **Adequacy**: The requirements of Fed. R. Civ. P. 23(a)(4) are met because the plaintiffs will adequately represent the proposed class, the remedy they seek will cure the injury of all proposed class members, and the undersigned are qualified to represent the class.

359.   The proposed class also satisfies Fed. R. Civ. P. 23(b)(2) because "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final

injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

360.     Accordingly, class wide injunctive and declaratory relief is appropriate and neces-

sary, and is in the best interests of judicial efficiency.

## CLAIMS FOR RELIEF

### COUNT I
### IMPERMISSIBLE CONSTRUCTION OF THE STATUTES

361.     The allegations in paragraphs 1 through 360 are re-alleged and incorporated herein.

362.     The agency's denial of permanent residence to the plaintiffs and the proposed class

is based on an impermissible construction of the governing statutes that is contrary to the plain and

unambiguous language of the statutes, and contrary to controlling precedent.

363.     Alternatively, the agency's denial of permanent residence to the plaintiffs and the

proposed class is based on an impermissible construction of the governing statutes that is unrea-

sonable and unworthy of deference under any applicable doctrine of administrative law.

364.     The plaintiffs and the proposed class have "suffer[ed] legal wrong," and have been

"adversely affected" and "aggrieved" by the actions of the defendant.    5 U. S. C. § 702.

365.     The defendant's denials of the plaintiffs' and the proposed class's applications for

permanent residence amounts to agency action that is "arbitrary, capricious, an abuse of discretion,

[and] otherwise not in accordance with law."    § 706(2)(A).

366.     As such, the plaintiffs and the proposed class are entitled to injunctive and declar-

atory relief, § 703, setting aside, § 706(2), the denial of their applications for permanent residence

under the Cuban Refugee Adjustment Act.

### COUNT II
### LACK OF REASONED CONSIDERATION

367.     The allegations in paragraphs 1 through 360 are re-alleged and incorporated herein.

368.    The agency's denial of permanent residence to the plaintiffs and the proposed class was done without reasoned and meaningful consideration of their legal claims.

369.    The plaintiffs and the proposed class have "suffer[ed] legal wrong," and have been "adversely affected" and "aggrieved" by the actions of the defendant.   5 U. S. C. § 702.

370.    The defendant's denials of the plaintiffs' and the proposed class's applications for permanent residence amounts to agency action that is "arbitrary, capricious, an abuse of discretion, [and] otherwise not in accordance with law."   § 706(2)(A).

371.    As such, the plaintiffs and the proposed class are entitled to injunctive and declaratory relief, § 703, setting aside, § 706(2), the denial of their applications for permanent residence under the Cuban Refugee Adjustment Act.

## PRAYER FOR RELIEF

Based upon the foregoing, the plaintiffs pray that the Court grant the following relief:

(a)    Assume jurisdiction over this matter;

(b)    Certify the proposed class, appoint the named plaintiffs as class representatives, and appoint the undersigned as class counsel;

(c)    Order the defendants to identify all other class members whose applications for permanent residence have been denied, administratively closed, or not yet adjudicated;

(d)    Declare that the plaintiffs and the other class members have been inspected and paroled into the United States, and that it is error for the defendant to deny their applications for permanent resident based upon a contrary conclusion;

(e)    Enjoin the defendant from refusing to recognize that the plaintiffs and the other class members have been inspected and paroled into the United States, and from denying their applications for permanent resident based upon a contrary conclusion;

(f)     Remand all of the named plaintiffs' and other class members' applications for perma-

nent residence to the defendant, and order the defendant to adjudicate those applications

in a manner consistent with the Court's declarations of law;

(g)     Order the defendants to reopen all of the class members' denied applications for per-

manent residence, and to adjudicate those applications in a manner consistent with the

Court's declarations of law;

(h)     Order the defendants to adjudicate all pending and future class members' applications

for permanent residence in a manner consistent with the Court's declarations of law;

(i)     Retain jurisdiction over this case to ensure compliance with all of this Court's orders;

(j)     Award costs, and attorney's fees under the Equal Access to Justice Act (EAJA), as

amended, 5 U. S. C. § 2412, and on any other basis justified under law; and

(k)     Grant any other and further relief that the Court deems just and proper.


Dated: September 3, 2021                    **s/ Mark Andrew Prada**

**Claudia Canizares**                       **Mark Andrew Prada**
Fla. Bar No. 98308                          Fla. Bar No. 91997
Canizares Law Group, LLC                    **Anthony Richard Dominguez**
8360 W. Flagler St., Suite 103              Fla. Bar No. 1002234
Miami, FL 33144                             Prada Urizar, PLLC
o. 305.680.0038                             3191 Coral Way, Suite 500
claudia@abogadadeinmigracion.us             Miami, FL 33145
                                            o. (786) 703-2061
                                            c. (786) 238-2222
                                            c. (440) 315-4610
                                            mprada@pradaurizar.com
                                            adominguez@pradaurizar.com

*Counsel for the Plaintiffs*